LORRIN A. THURSTON, Minister of Interior, *vs.* C. R. BISHOP, S. M. DAMON, C. M. HYDE, C. M. COOKE and J. O. CARTER, Trustees of the Estate of MRS. B. P. BISHOP, Deceased.

EXCEPTIONS FROM MR. JUSTICE DOLE. JURY WAIVED.

OCTOBER TERM, 1888.

JUDD, C.J., McCULLY, PRESTON, BICKERTON and DOLE, JJ.

No claim to the land called "Opu" had been presented to the Commission to Quiet Land Titles within the time limited by Statute for filing such claims (14th February, 1848,) and the land had not been awarded by the Commission to anyone, nor had a royal patent been issued to anyone for it.

The land was in possession of defendants, who held whatever interest was in Lot Kamehameha at the time of his death. L. Kamehameha received the land by oral bequest in 1840 from a High Chief who was then in possession of the land.

L. Kamehameha was a minor when the time for filing claims for land before the Land Commission expired.

Held, that by the force and effect of the statute creating the Land Commission (Section 8, Acts of 1846, p. 109), the claim which defendants' predecessor had to this land was barred in law by reason of its non-presentation to the Commission, and they have no title to it: the land not being held by defendants by some title proceeding from the Government, it is still the property of the Goverment. The Declaration of Rights in the Constitution of 1840, securing to the people their lands, is not violated by the bar in the statute above referred to, for at the time of the Declaration of Rights the people had no titles to land, and the statute provided a method by which titles could be obtained.

The statute referred to is a general statute of limitation, and no exception being made there in favor of infants, it ran against L. Kamehameha, notwithstanding his infancy. By the common law of this Kingdom, prior to the Act of August 4, 1851, probate guardians, and fathers as natural guardians of minors, had the power to manage and dispose of the real estate of their wards.

M. Kekuanaoa, as the father and natural guardian of Kamehameha, put before the Land Commission claims to other lands for his son. His failure to claim the land now in suit bound the minor.

The defendants not showing any title or right of possession to this land, their possession as against the Government can never ripen into a title.

OPINION OF THE COURT, BY JUDD, C.J.    MR. JUSTICE DOLE, Dissenting.

This action was brought at the April Term, 1888, of this Court. The jury was waived, and the case heard by Mr. Justice Dole in vacation, by consent of parties. The following is the decision of the Court rendered on the 24th July:

"This is a suit in ejectment in which the plaintiff claims for the Government the Ili of Opu, on the ground 'that it has never been and is not now awarded, patented, granted or leased under or by virtue of any land award, royal patent or Government grant or lease, and that by the law applicable in such cases, the Hawaiian Government is the absolute and unlimited owner thereof,' or in other words, that the Goverment by virtue of its sovereignty is the owner of all lands which are not held by some title proceeding from itself.

"The defendants, on the other hand, claiming the ownership of this land from a period anterior to the establishment of the Hawaiian Government as a separate authority from the will of the King, offer two distinct lines of defense, as follows: 1st. That Kamehameha III. was the sole owner of all the lands of the Kingdom by virtue of the sovereignty which he received from his predecessors, subject, however, to certain undefined rights of chiefs and people, and that having satisfied such rights by the concessions which were carried out by the Land Commission and the *Mahele*, the ownership of other lands not disposed of remained in him, and has descended to his heirs; and the land in dispute being one of such unassigned lands, now legally vests in the defendants; and 2d, That the chief Hoapili was formerly in possession of this land, and was the recognized owner thereof according to the ancient system of

land tenure; that when he died, in 1840, he gave it, or left it, by oral bequest, to Lot Kamehameha, since Kamehameha V., then about ten years old, and that it was held for and by Lot Kamehameha without interruption until his death, in 1872, and thereupon vested in his heirs.

"There is little dispute as to the facts in the case. It is admitted by the plaintiff that Hoapili was in possession of the land, and gave it to Lot Kamehameha in 1840, and that the latter afterwards enjoyed it until his death. It is also conceded by the plaintiff that the defendants are entitled to whatever interest was in Lot Kamehameha at his death.

The two lines of defense are inconsistent with each other, or may be said to be in the alternative. The evidence adduced in support of the second line of defense, and the facts admitted by the plaintiff, authorize me to find as a conclusion of fact, that Hoapili held this land for an indefinite period and transferred it to Lot Kamehameha in 1840, and that the latter enjoyed it until his death.

"With this finding of fact, I need not consider the other line of defense, based upon the sovereign title of the King, as by the Declaration of Rights announced in the year 1839, protection was assured to all persons with their lands and other property, with the guarantee that 'nothing whatever shall be taken from any individual except by express provisions of the laws.' (Old Laws, 10.) This Act divested the King of his sovereign right of control of the Ili of Opu, and gave Hoapili and his representatives an interest in it which, under the provision of the law creating the 'Board of Commissioners to Quiet Land Titles,' generally known as the Land Commission, enacted December 10, 1845, and the 'Principles adopted by the Board of Commissioners to Quiet Land Titles, in their adjudication of claims presented to them,' August 20, 1846, and approved by resolution of the Legislative Council, October 26, 1846, became a claim to land, which should have been presented to the Land Commission for adjudication before February 14, 1848. There can be no doubt that the Land Commission was authorized to recog-

nize private interests in lands by virtue of royal grant or gift made orally and anterior to 1839. 'For the purposes of this Board in all cases where the land has been obtained from the King or his authorized agent without a written voucher, anterior to the 7th of June, 1839, the Board will inquire simply into the history of the derivation; and if the land claimed has been continuously occupied, built upon, or otherwise improved, since that time, without molestation, the Board will, in case no contests exist between private claimants, infer a freehold less than allodial.' (Principles of the Land Commission, 2 Statute Laws, 92.) .

"It is admitted by the defense that no claim for this land on behalf of Lot Kamehameha was presented to the Land Commission according to law. Under these circumstances, therefore, it is clear to me that the land in question vested in the Hawaiian Government by virtue of the failure to present the claim for it to the Land Commission as aforesaid, unless there were circumstances which excepted Lot Kamehameha from the operation of the rule of the Land Commission, barring claims not presented in time. (1 Statute Laws, 109, Section 8; 2 Statute Laws, 93.) Counsel for defendants claim that there were such circumstances in the fact of Lot Kamehameha being a minor during the time when claims might be presented. It is not denied by the plaintiff that he was a minor during such period, and the evidence shows that he was born in 1830, and consequently was less than twenty years of age at the termination of the time for presenting claims, on the 14th of February, 1848. Twenty years was fixed as the age of legal majority by the Act of 1845 to organize the Executive Departments. The law authorizing the appointment of the Land Commission provides that claims not presented within the required period 'shall be forever barred in law, unless the claimant be absent from the Kingdom, and have no representative therein.' (Statute Laws, 109, Section 8.) No exception is made in the case of a minor. The Declaration of Rights guarantees 'that nothing whatever shall be taken from any individual except by express provision of the laws.' Would

the destruction of a minor's rights for failure of due presentation of his claims be a taking of his property by express provision of the laws, within the meaning and intent of the Declaration of Rights? It does not seem to me that such an application of legal proceedings could have been contemplated. But it may be argued, Lot Kamehameha, though a minor, was or might have been represented by his father as his natural guardian. As a matter of fact, I find from the public record of the *Mahele* that Kekuanaoa, his father, signed the *Mahele* deed, in regard to other lands, for his son Lot Kamehameha, signing himself as father and guardian. He might undoubtedly, under the then existing statute, have presented a claim for the Ili of Opu to the Land Commission on behalf of Lot Kamehameha; but he did not, and the question is—can his or anyone's failure to do so prejudice the rights of his minor son?

"'An infant shall lose nothing by non-claim or neglect of demanding his right, nor shall any other laches or negligence be imputed to an infant, except in some very particular cases.' (1 Wendell's Blackstone's Com., 464.)

"'The Court will protect the rights of infants where they are manifestly entitled to something, although their guardian *ad litem* neglects to claim it on their behalf.' (*Stephen et al. vs. Van Buren et al.*, 1 Paige, 479, *syllabus.*)

"'The general rule of the present day is, that an infant shall be bound by no act which is not beneficial to him.' (Schouler's Dom. Rel., 532.)

"'One leading principle runs through all cases which relate to infants. It is that such persons are favorites of the law which extends its protection over them, so as to preserve their true interests against their own improvidence, if need be, or the designs of others.' (*Ibid.*)

"From these authorities it would appear to be the correct conclusion of law that Lot Kamehameha was not barred of his rights in this land from his or anyone's failure to present his claim within the time required by law, and I so rule. After he became of age there was no opportunity afforded for the pre-

sentation of his claim, unless it is found in the two Acts for the relief of certain Konohikis, approved August 10, 1854, and August 24, 1860, respectively, but as both of these Acts relate only to Konohikis who were entitled to lands under the *Mahele*, they offered no opportunity for obtaining an award to the Ili of Opu, as it was not among the lands divided by the *Mahele*.

"Under these principles, therefore, and the evidence submitted, I do not find a right of possession to this land in the plaintiff, and order judgment to be entered for the defendants."

To the rulings of law therein made, the plaintiff excepts as follows:

"This was an action of ejectment, in which the plaintiff claimed as Minister of the Interior to be entitled to the possession of certain land described by metes and bounds called the Ili of Opu, as part of the public or Government lands of the Kingdom, which has never been and is not now awarded, patented, granted or leased under or by virtue of any land award, royal patent or Government grant or lease; and that by the law applicable in such cases, the Hawaiian Government is the absolute and unlimited owner thereof, and that the said land herein claimed, and the right to the possession, custody, charge and supervision thereof, are by law vested in the plaintiff as such Minister of the Interior.

"The Court found upon the evidence that the said land has never been and is not now awarded, patented, granted or leased under or by virtue of any land award, royal patent or Government grant or lease, except a certain ancient lease now expired, of which a copy is on file, marked Exhibit L.

"The Court also found upon the evidence and upon the plaintiff's admissions that the said land was in the possession of the chief Hoapili up to his death, in 1840, and that he gave or left it by oral bequest to Lot Kamehameha, afterwards Kamehameha V., then about ten years old, who thereafter until his death, in 1872, held and occupied it without interruption,

and that whatever title therein was held by him at his death has descended and become vested in the defendants.

"The Court also found as a fact that at the date when the time for filing claims before the Land Commissioners had expired, Lot Kamehameha was between eighteen and nineteen years of age.

"The Court also found upon the evidence that Kekuanaoa, the father of Lot Kamehameha, signed the Mahele Deed in regard to other lands of his said son than that claimed in this action, but that no claim to this land called Opu was ever presented to the Board of Commissioners to Quiet Titles in Land.

"The Court ruled as a matter of law that said Lot Kamehameha was not barred of his rights in said land called Opu by reason of his own or anyone's failure to present such claim within the time required by law before the Board of Commissioners to Quiet Titles in Land, basing such ruling upon the fact of said Lot Kamehameha's non-age.

"Wherefore the Court ordered judgment for the defendants, to which judgment, as well as to said ruling of law, the plaintiff duly excepted, and such exceptions were allowed by the Court."

## By the Court.

The sole question which is presented by these exceptions is, whether the law was correctly laid down by Mr. Justice Dole, that Lot Kamehameha was not barred of his rights in said land called Opu, by reason of his own or anyone's failure to present such claim within the time required by law before the Board of Commissioners to Quiet Titles in Land, by reason of the non-age of the said Lot Kamehameha.

The decision of Mr. Justice Dole, that under the circumstances (to wit: that no claim to this land had been presented before the Land Commission within the time for filing such claims), "the land in question vested in the Hawaiian Government, * * * unless there were circumstances which excepted Lot Kamehameha from the operation of the rule of the Land Commission barring claims not presented in time," is not

now open to review, it not being excepted to by either party. We proceed, therefore, to the question whether the infancy ot the defendants' ancestor excepted him from the effect of the statute, and prevents the Hawaiian Government from now recovering the land of those who claim the right of possession to the land through him. But in this discussion it will become necessary to review the nature of the claims for landed property or rights in land which existed prior to the Land Commission, and also the nature of the statutes establishing the powers and jurisdiction of the Commission, in order to properly decide the remaining question.

There is a time in the history of every original nation not formed by colonization, when, as it emerges from barbarism into civilization, titles to land may be said to have a beginning by positive institution of the people of such nation. Previous to the advent of Christianity to this country, in the early part of this century, Kamehameha I., as King by right of conquest, was the lord paramount and owner of all the land of this Kingdom. This right continued in his successors until the reign of Kamehameha III. Under this King a government, under a constitution and laws, had its birth, superseding a government of the arbitrary will of the King.

Claims of one character and another to the possession of land had grown up, but there was no certainty about them, and all was confusion; and finally, after years of discussion had between the King, the chiefs, and their foreign councillors, the plan of a Board of Commissioners to Quiet Land Titles was evolved, and finally established by law, for the purpose of settling these claims and affording an opportunity to all persons to procure valid paper titles emanating from the Government representing the sovereignty, the source of all title to land in this Kingdom, to the land which they claimed. As a part of this scheme, Kamehameha III., with unexampled magnanimity, relinquished his claim of ownership as sovereign to over two-thirds of the entire territory of the Kingdom, in order that the same might be awarded to the chiefs and common people by the Land Com-

mission. The Commission was authorized to consider possession of land acquired by oral gift of Kamehameha I., or one of his high chiefs, as sufficient evidence of title to authorize an award therefor to the claimant. This we must consider as the foundation of all titles to land in this Kingdom, except such as come from the King, to any part of his reserved lands, and excepting also the lists of Government and Fort lands reserved. The land in dispute in this case is not one of those specifically reserved by the King, Kamehameha III., to himself and his successors, and not being in the lists of lands specially set apart as Government or Fort lands, must be one of those over which the Land Commission had jurisdiction to award to the claimant.

The Land Commissioners were, by Section 1 of the Act creating it (page 107, Stats. 1846,) a Board for the investigation and final ascertainment or rejection of all claims of private individuals, whether natives or foreigners, to any landed property acquired anterior to the passage of this Act (10th December, 1845).

Section 8 of this Act prescribed that " all claims to land as against the Hawaiian Government which are not presented to said Board within the time, at the place, and in the manner prescribed in the notice required to be given in the fifth section of this article, shall be deemed to be invalid, and shall be forever barred in law, unless the claimant be absent from the Kingdom, and have no representative therein."

It is clear from a reading of the " Principles " adopted by the Board of Commissioners to Quiet Land Titles in their adjudication of claims presented to them, that the "whole power of the King to confer and convey lands to which private equitable claim now attaches reposed in the Commission " (page 85), which, as fully explained thereafter, means " the King's private or feudatory right as an individual participant in the ownership."

But it is argued by the counsel for defendants that "this land is not claimed of the Government, but it is claimed under grant from Kamehameha I. to Kameiamoku, father of Hoapili, and

from the latter it passed to Lot Kamehameha.." That the " Government" in this sense means the King, as representing the Government, is clear from the text of the " Principles," page 82, "that the King really owned the allodium in all the land of the Kingdom, and the person in whose hands he placed the land, holding it in trust." Also these principles declare that the Act of 1839 (Declaration of Right, page 10) "recognizes but three classes of persons having rights in the land, the King or Government, the landlords and the tenants." And on page 83 it is further set forth "that there were but three classes of ' persons having vested rights in the lands : (1) The Government ; (2) the landlord ; (3) the tenant."

The whole context of these " Principles" shows that the land tenures of this Kingdom were to be settled on the basis that the King—meaning the State or Government—had one-third of any given land held by a landlord (generally a chief) ; and if it had tenants upon it (if all parts of the land were equally valuable) the landlord would take one-third, and the tenants the remaining third. An allodial title would be given by the Land Commission to the lord (the chief), an allodial title in severalty to the tenants, and a third would remain in the King or Government. The terms " King" and " Government" are, as we see, used interchangeably. They mean the ' State" in each case.

A fee simple was obtained by the lord by extinguishing the right of the King, either by a payment in money, or by a surrender of other lands in value equal to the King's interest in the land. This is called the " Government's Commutation," and the money paid or the lands surrendered invariably went to the Government. On page 93 of the " Principles," it is stated that " the share of the Government, or the body politic, to be commuted for with the Minister of Interior, etc., etc., should extinguish the private rights of the King in the land." The object of this discussion is to show that Section 8 of the Act of 1845 is correct in its phraseology when it recites that all claims for land " as against the Hawaiian Government" must be presented, etc. As is forcibly said on page 83 of the " Principles,"

"claims for land even by purchase or gift from the King, must be presented to the Commission for adjudication." "Such ownership must be proved or it cannot be acknowledged, for the King, representing the Government, having formerly been the sole owner of all the soil, he must be considered to be so still unless proof be rendered to the contrary: and even possession of ever so long standing cannot be proof," etc. "The Land Commissioners, by virtue of their appointment from the King, had conferred upon them all his private and public power over the corporate property in lands claimed by private parties, which in the nature of things he can delegate," (p. 87 of Principles).

Certainly the Land Commission was not authorized to hear law suits between private individuals, as regards the ownership of land. There were courts established with this jurisdiction. It was only when there was a counter claimant intervening, that the Land Commission was called upon to decide which had the best claim as against the State. In such case each party had to present his claim against the King or Government, as the source of all title. It has been uniformly held, sustaining this theory, that where two awards of the Land Commission cover the same territory, the earlier award prevails.

It must be remembered that these "Principles," however much they may be criticised at the present day, were statutory law, having been adopted by the Legislative Council, consisting of the Nobles and Representatives, on the 26th October, 1846, and "all claims for landed property shall be tested by those principles and according to them be confirmed or rejected." (Stats. of 1846, Vol. 2, p. 94.)

A notice was published by the Commission "to all claimants of lands in the Hawaiian Islands," dated 11th February, 1846, viz: "All persons are required to file with the Board, by depositing with its Secretary, specifications of their claims to land, and to adduce the evidence upon which they claim title to any land in the Hawaiian Islands, before the expiration of two years from this date, or in default of so doing they will after

that time be forever barred of all right to recover the same in the courts of justice."

Paragraph seven, on p. 93, closes the Principles with the declaration, as a warning to all claimants of land, that " the titles of all lands, whether rightfully or wrongfully claimed, either by natives or foreigners, in the entire Kingdom, which shall not have been presented to this Board for adjudication, confirmation or rejection, on or before the 14th day of February, 1848, are declared to belong to this Government by Section 8 of the article creating this Board. Parties who thus neglect to present their claims, do so in defiance of law, and cannot complain of the effect of their disobedience."

This construction put upon the statute, that a failure to present a claim within the prescribed time absolutely barred the claimant, by the Legislative power of the Kingdom, the King and the Nobles and the Representatives, and uniformly concurred in and acted upon by successive Governments under many reigns following, and to this day, undisturbed by any judicial decisions, we are not at liberty to disregard.

What, then, was the title or claim to this land which Lot Kamehameha had at the institution of the Land Commission? It was a right to present a claim for this land to the Land Commission, and which claim, if sustained by evidence, would have entitled him to an award therefor, or to a royal patent, signed by the King, upon his extinguishing the Government share therein, both award and patent being subject to the rights of tenants, if any there were.

It is claimed that a construction of Section 8 of the Act of 1845, which would deprive Lot Kamehameha of this land of which he then had possession, would conflict with the provision of the Constitution of 1840, or Declaration of Rights, viz: " Protection is hereby secured to the persons of all the people, together with their lands, their building lots and all their property, while they conform to the laws of the Kingdom, and nothing whatever shall be taken from any individual except by express provision of the laws."

We interpret this to mean that whatever rights to land the chiefs and people had, were to be protected. Possession of land was not to be disturbed. The landlords were not to dispossess their tenants without cause, nor should the King dispossess his chiefs. See Laws of 1839 and 1840, found in Old Laws, p. 33.

The statute therefore deprived Lot Kamehameha (on his failure to present his claim to the Commission) of what? Not of this land, for he had no title to it, but only of his right to present a claim for it, which was all the interest he had.

This interest or right the Declaration of Rights secured to him, "Nothing should be taken from him without express provision of the laws." And in 1845 "the express provision of the law" warned him that to secure his title to this land he must present his claim to it before the Commission within the time limited. We fail to see how the letter or spirit of the Constitution of 1840 is violated by the Act of 1845, constituting the Land Commission. Chiefs and people had at that time only a qualified right of possession to lands. They had no titles to them. The law afterwards, which was not inconsistent with the Constitution of 1840, but which was in furtherance of its guarantees, provided a method by which titles could be obtained.

Section 8 of this law (Act of 1845) is a general statute of limitation. All claims to land, unless presented in time, were to be deemed invalid and shall be forever barred in law, excepting only in case of absentees, i.e., "unless the claimant be absent from this Kingdom and have no representative therein." No exception is made in favor of infants. Statutes of limitation are to be strictly construed by courts of justice.

In *Demarest vs. Wynkoop*, 3 Johns. Ch., 129, Chancellor Kent says: "The statute has no saving clause for persons laboring under disability, but it is peremptory that no sale under such power shall be defeated to the prejudice of any *bona fide* purchaser, in favor of any person claiming the equity of redemption. Where the statute makes no exception, the Court can make none on the ground of any inherent equity applicable to infants." In reviewing the cases which enlarge upon the

28

policy of statutes of limitation, to quiet possession and extinguish dormant claims, the Chancellor says: "According to an expression of Lord Eldon, a 'right might travel through minorities for two centuries.' It would be impolitic as well as contrary to established rule to depart from the plain meaning and literal expression of the proviso in the statute of limitations;" and on page 140 of the decision the Judge says: "The doctrine of any inherent equity creating an exception as to any disability, where the statute of limitation creates none, has been long, and I believe uniformly, exploded. General words in the statute must receive a general construction; and if there be no express exception, the Court can create none."

We believe this rule to be established beyond controversy. *Hall vs. Bumstead,* 20 Pick., 8; *Beckford vs. Wade,* 17 Vesey, Jr., 87; *Bell vs. Morrison,* 1 Peters, 360.

This view is decisive of this case. The statute made no exception in favor of infants, and we can make none. By Section 7 of the Act creating the Land Commission, it was to make its decisions "in accordance with the principles established by the Civil Code of this Kingdom in regard to prescription, occupancy, fixtures, native usages in regard to landed tentures, water privileges and rights of piscary, the rights of women, the rights of absentees, tenancy and subtenancy, primogeniture and rights of adoption."   *   *   *   *   *   *   *   *   *

It is to be noticed that the subject of "infancy" is not mentioned. This is an additional reason for not admitting the disability of infancy as an exception to the statute. Claims of infants were presented by their parents or guardians. A large number of awards to Lunalilo and Victoria Kamamalu show this. These high chiefs who succeeded to the lands of Kekauluohi and Kinau respectively, both being infants at the time of the presentation of their claims, received awards for land exceeding any other claimants in number and extent.

It is also very significant that Kekuanaoa, the father of Lot Kamehameha, presented other claims to land in behalf of his son, upon which awards were made. By the law of this

country at that time he was the proper one to make such application. In *E. K. Laanui vs. Puohu et al.*, 2 Hawn., 162, the Supreme Court, per Allen, C. J., said : "By the common law of this Kingdom, prior to the enactment of a law regulating guardians and wards, approved 4th August, 1851, guardians had from time immemorial possessed and exercised the absolute right to dispose of the real and personal estate of their wards as might suit their own will." The case of *Lot Kamehameha vs. J. D. Kahookano et al.*, 2 Hawn., 118, has greater significance, for the plaintiff is the same person from whom defendants claim in the case at bar. Here Kekuanaoa was not the probate guardian of Lot Kamehameha, but he was his father, and Judge Robertson, for the Court, says as against the objection made that he was not the guardian of the plaintiff's estate and could not make a legal dedication of the right of way in question: "That Governor Kekuanaoa, in 1848, as the natural guardian of the plaintiff, rightfully had and exercised, under the law of this Kingdom, the control and management of the plaintiff's property, is, we think, too clear a proposition to admit of a question; and that any grant of way over the plaintiff's land, or any conveyance whatever of any part of his estate, made by Governor Kekuanaoa during the plaintiff's minority, and before the enactment of Section 54 of the Act regulating guardians and wards, passed on the fourth day of August, 1851, must be considered absolutely conclusive and binding upon the rights of the plaintiff, is, in our opinion, equally clear."

Finding, then, that there was during all the time when claims for land were required to be made before the Land Commission, a person competent in all respects to make such claim for this land in behalf of Lot Kamehameha, the statute ran against him. The acts of Kekuanaoa, as father and natural guardian of Lot Kamehameha, bound his infant ward in respect to claims before the Land Commission as fully and conclusively as if they had been done by Lot Kamehameha himself, if of full age.

But it is said that an infant is not bound by the failure of his guardian to act for him when such failure is prejudicial to the minor.   This would not be a true statement of the law as it existed in this country in 1848-9 (the time of the Land Commission), for if, as we have seen, the law was that all acts of a guardian or father (if no guardian be appointed) respecting the disposition of an infants property, bound the infant, his failure to present a claim for land is an "act," the consequences of which would be equally binding upon the infant.   It must be admitted that if Kekuanaoa had made an appearance before the Land Commission, and had disclaimed any interest of his ward in this land, or had surrendered the same by a conveyance, it would have bound the ward; and it follows as a natural inference that as some affirmative action was required by statute of all claimants to land, and as nothing was required of those who did not claim land, a failure to claim would mean the same thing as a formal declaration that the infant had no claim to the land.

But if it be conceded, for the purposes of argument, that inherent equity should make an exception in behalf of the minor in this case, how does the law regard his position ?   Considering the statute which barred all claims unless presented to the Land Commission before 14th February, 1848, as in effect a judgment against the infant in respect to this land, it would be his right on arriving at majority to avoid the judgment by assertion of his claim to the land, and in excuse of his delay to assert his non-age at the time when claims should be presented.   He became of legal age (20 years old) on the 11th December, 1850. On the 26th of August, 1847, the Legislature extended the powers of the Land Commission for taking testimony, examining, settling and awarding upon all such claims to land as shall have or may be presented to them prior to the fourteenth day of February, 1848, to one year—that is, to the 14th February, 1849. And on the 13th June, 1848, their powers were further extended "for such a period as shall be necessary for the full and faithful examination, settlement and award upon all such claims as

may have been presented to said Board," and on the 20th July, 1854, the Legislature passed an Act providing for the final dissolution of the Board on the 31st March, 1855. In this Legislature Lot Kamehameha was a member, having been admitted to the House of Nobles by an Act of the 12th May, 1852.

If his disability of infancy at the date when the time for presenting claims to the Land Commission expired, February 14, 1848, excepted him from the operation of the statute, it was his duty to assert his claim to this land within a reasonable time after his coming to full age. The Land Commission would, doubtless, have rejected his claim, if made, as being barred by the lapse of time, the statute making no exception in his favor. But if the law were otherwise, and his plea of infancy was good at any time, it was certainly good while the Land Commission, the only court of competent jurisdiction to decide upon his claim, was in existence. The knowledge that the functions of this Court would soon expire should have warned him to press his claim then. Moreover, if his disability was a good excuse in law for not presenting his claim to the Board, a mandamus, on his becoming of age, from the Supreme Court to the Board, would have secured for him all the rights which he could have had by a presentation of his claim within the statutory time.

How can a mere claim to have his title to this land considered and adjudicated, be considered to have ripened into a perfect title at this late day, or rather into such a title as gives the devisees of his heirs-at-law a right of possession against the State ?

There is no prescription against the State. *Lindsey vs. Miller's Lessee,* 6 Pet., 666. The Supreme Court of the United States say in this case : "It is a well settled principle that the Statute of Limitations does not run against a State. If a contrary rule was sanctioned, it would only be necessary for intruders upon the public lands to maintain their possessions until the Statute of Limitations shall run ; and then they would become invested with the title against the Government and all persons claiming

under it. In this way the public domain would soon be appro-priated by adventurers. Indeed it would be utterly impracticable, by the use of any power within the reach of the Government, to prevent this result. It is only necessary, therefore, to state the case, in order to show the wisdom. and propriety of the rule that the statute never operates against the Government." This was adopted in *Kahoomana vs. Minister of Interior*, 3 Hawn., 635.

If the defendants show no title or right of possession to this land, their naked possession can never ripen into a title, however much it may afford ground for liberal dealing with them in negotiations for a title from the Government.

This case last quoted involved the question of ownership of land not covered by any award of the Land Commission, royal patent or deed from the King. The Land Commission did not award it, and the Court say : " By force and effect of the statutes above quoted (those now under discussion), it must be considered to still belong to the Government." The only difference between that case and the one at bar is, that in claims for lots in the towns there was in them no third class of persons, as chiefs or lords, having intermediary ownership over tenants, and the tenant got his claim awarded direct, paying commutation to the Government, and such a lot of land would escheat to the Government and not to the owner of the ili or ahupuaa from which it may originally have been taken.

The State in the case at bar claims the land as public domain, not awarded or granted to anyone. A decision that the defendants have the right of possession thereto, though showing no title, would be equivalent to a declaration that defendants have a title in fee simple, although it is admitted that they have never commuted for the Government's right therein, for a right of possession as against the State would be good enough title to any land. If lands unawarded by the State are still the property of the State, those who occupy them are trespassers, and must yield the possession on demand to the State which holds the title, since the right of possession follows the title. The

most that can be said on behalf of the defendants is that whatever claim they may have is an equitable one, and this would be no defense to an action of ejectment.

Having found that the infancy of Lot Kamehameha is no defense to this suit, we find upon principle and authority that the plaintiff, upon all the facts, is entitled to recover possession of the land described in the declaration, and accordingly order judgment to be entered in his favor, as in the nature of a judgment, *non obstante veredicto*.

*A. S. Hartwell*, for plaintiff.

*P. Neumann* and *F. M. Hatch*, for defendants.

---

CONCURRING OPINION OF MR. JUSTICE McCULLY.

The Court, sitting in this ejectment case without a jury, delivers the rule of law and a special verdict in its decision. It has held that lands not awarded by the Land Commission (presumably excepting the lands reserved by the King, and which have since become the Crown Lands) became the property of the Hawaiian Government, all right to make a claim for them having been barred by the provisions of Section 8 of the Statute creating the Land Commission.

But it has held that the claim of one who was a minor at the date when the right of application closed, was by exception not barred, and that it having been proved that Lot Kamehameha was a minor at that date, it finds a verdict for the defendants.

The case before us cannot be considered apart from its public and historical relations. At the time of the *Mahele*, and at the institution of the Board of Land Commissioners, and the legislative ratification of the principles declared by it, Lot Kamehameha, his brother Alexander Liholiho, and his sister Victoria Kamamalu, were minors. We may add the names of Moses Kaikioewa, another brother, who died in 1848, and of W. C. Lunalilo, also minors. These were by far the most important young chiefs of the country. They were the heirs to existing chiefs' rights in very large and numerous estates or lands. The rights were not in the fathers' lands, for they were living. The

estates which the fathers received by the *Mahele* and the awards of the Land Commission were greatly inferior to those of their children, for their children were much higher in rank through their mothers. Victoria Kamamalu was the female heir of the great Kaahumanu, receiving from her, by preference over her brothers, the largest estate in the Kingdom, and the rank and dignity of Kuhina Nui, almost equivalent to a dual kingship. Lot Kamehameha was the heir in like manner of the Hoapilis, their estates and the hereditary governorship of the Island of Maui. They would not reach majority during the time limited for filing claims.

The father of the four first mentioned chiefs, M. Kekuanaoa, Charles Kanaina, the father of Lunalilo, and John Ii, the guardian of the person of Victoria, all then in the prime of life and men of great influence in public affairs, were members of the Privy Council. It was in that body, which at that time had a function of the first importance in the Government, that the problem of placing the land of the Kingdom upon a basis of separate and fee simple ownership was most exhaustively discussed, and therein the plan of the *Mahele* and the Board of Land Commissioners was accepted as the solution. Two were coupled together. The phraseology of the release on the part of Kamehameha III., of his interest in the lands *maheled* or divided off to the chief, is in this form, taking the *Mahele* of Lot Kamehameha for the instance:

"Ke ae aku nei au i keia mahele. Ua maikai. No Lota Kapuiwa Kamehameha na aina i kakauia maluna. Ua ae ia'ku e hiki ke lawe aku imua o ka Poe Hoona Kuleana.

"(Signed)        KAMEHÁMEHA."

Which, translated, is:

"I hereby assent to this division. It is good. To Lot Kapuiwa Kamehameha are the lands above written. It is hereby allowed to take them before the Board of Commissioners," etc.

The same men were also members of the Legislative Council which enacted the statute containing the section under discussion.

M. Kekuanaoa signs the *Mahele* book for the lands relinquished by Lot Kamehameha, as father and guardian of the property of L. K. Kamehameha. He signs in like manner for his other children—in the case of the *Mahele* of Victoria, John Ii also signing as the guardian of her person. Charles Kanaina signs as the father and guardian of the property of W. C. Lunalilo.

The act amounted to a quit claim deed of their wards' interest in the lands released.

The guardian had authority to dispose of the ward's real estate, without order of a court in probate. *Kamehameha vs. Hookano*, 2 Hawn., 118.

In my view this was a binding act for all that comes within its scope. The *Mahele*, or Division, was designed to be for each claimant an entire and conclusive act. The omission of a land from the list which was to be divided would amount to a positive waiver of claim, and the guardian had the legal right to make it. This appears by the decision cited above, and it is plainly inferable from the nature and necessity of the case.

A division was to be made upon which should be established titles of all the real estate of the Kingdom. I think it is not a tenable proposition that those who were represented by guardians had a right to take a division for a part of their claims, and by omission to present others have a right to hold them thereafter. To have carried out the view that it was optional for a guardian to present a part or any of his ward's claims to the Board without the result of barring those not presented, would have defeated the purposes of the statute.

The minors above named, before the severance of the Government's half, held this kind of unsettled claim in a very considerable portion of the territory of the Kingdom—perhaps as much as one-fifth in value—and in the view that their titles would have held good, so much would have remained undivided and " unquieted " forever.

But apart from the interpretation given by the historic view of this case, it does not appear to be the law that statutes of limitations should not be construed strictly and literally.

There is an exception expressed in the statute in favor of claimants absent from the Kingdom, and having no representatives therein. These excepted cases must have been exceedingly few. The rule of construction, *expressio unius est exclusio alterius*, then, ought to exclude all other exceptions.

"The Court disclaims all right or inclination to put on statutes of limitation, which are found to be among the most beneficial to be found in our books, any other construction than their words import." Per Livingstone, J., in *Fisher vs. Harnden*, Paine Cir. Ct., 61.

"A statute of limitations, instead of being viewed in an unfavorable light as an unjust and discreditable defense, should have received such support from courts of justice as would have made it what it was intended emphatically to be, a statute of repose." Per Mr. Justice Story in *Bell vs. Morrison*, 1 Peters, U. S., 360.

"The courts do not now, (1830) unless compelled by the force of former decisions, give a strained construction to evade the effect of statutes of limitation." Per Mr. Justice McLean in *McCluney vs. Silliman*, 3 Peters, U. S., 270.

The above are cited from Angell on Limitations, and the author draws the general conclusion from all the authorities that statutes of limitation are to be strictly construed by the court, and that although there have been some instances in which this rule has been departed from, owing to conceptions of inherent equity, they have altogether failed in establishing a contrary precedent. Chapter XXXVII.

In *Beckford vs. Wade*, 17th Vesey, Jr., 87, where the question was of excepting by construction absentees from the Island of Jamaica from the operation of a statute converting a possession for seven years, under a deed, will or other conveyance, into a positive title, Sir Wm. Grant, Master of the Rolls, says: I have not been able to find any authority whatever for this doctrine; and he says: "The true rule on this subject is laid down by Sir Eardly Wilmot, in his opinion in the House of Lords in the case of *Lord Buckinghamshire vs. Drury*, who says many cases

have been put where the law implies an exception, and takes infants out of general words by what is called a virtual exception. I have looked through all the cases, and the only rule to be drawn from them is, that where the words of a law in their common and ordinary signification are sufficient to exclude infants, the virtual exception must be drawn from the intention of the Legislature manifested by other parts of the law, from the general purpose and design of the law, and from the subject matter of it." In all of which respects, in my opinion, an interpretation is given contrary to making the exception. And the same authority says: "Infants, like other persons, would be barred by an act for limiting suits at law, if there were no saving clause in their favor."

### DISSENTING OPINION OF MR. JUSTICE DOLE.

The main question raised by plaintiff's exceptions to the findings and judgment of the Court below, is whether or not Lot Kamehameha, being a minor during the time limited by the Board of Commissioners to Quiet Land Titles for the presenting of claims, was deprived of whatever interest he had in the premises in question through the non-presentation of his claim by him or by any one for him. Wood on Limitations of Actions, Section 1, says, "Statutes of limitation are such legislative enactments as prescribe the periods within which actions may be brought upon certain claims or within which certain rights may be enforced." The statute creating the Board of Commissioners provides for such a limitation, (Sections 5 and 8) but the principles adopted by the Board of Commissioners, and confirmed by the Legislature, extended the force of the statute to the extent of declaring that the titles of all lands which shall not be presented to the Board for adjudication on or before the 14th day of February, 1848, shall vest in the Government (2 Statute Laws, 93). This feature of the law adds to its severity and takes it somewhat out of the description of a statute of limitation of actions given by Wood, and is specially important in considering the rights of a minor under this law,

because its action, upon failure to present a claim within the time limited, is in the nature of a decree of a court adjudicating the title of real property. The only similar statutes that I know of are the Act of Congress of March 3d, 1851, for establishing a commission for the settlement of private land claims in the State of California, and other United States laws for the settlement of private land claims in territory acquired by the United States from other Governments, and the possessory law of the Island of Jamaica, hereinafter referred to. The Act of Congress of 1851, however, differs from the Hawaiian Statute establishing the Land Commission, in that the former contemplates only the adjudication of the question of title between the government and the individual, while the latter makes the decision of the Land Commission in favor of a claimant the creation of an absolute title, commutation being settled, against all the world. (Act to provide for the dissolution of the Board of Commissioners to quiet land titles, Section 3, approved July 20th, 1854.) It is evident from this, and the provisions of the "Principles" of the Land Commission (2 Statute Laws, 92) for the decision of contested claims, that the proceedings necessary to the filing and hearing of a claim before the Land Commission were in the nature of a suit at law, requiring adult intelligence and competency. This necessity is emphasized by the following words of the "Principles" of the Land Commission. "Parties who thus neglect to present their claims do so in defiance of the law, and cannot complain of the effect of their own disobedience," (2 Statute Laws, 93-94) : words which may apply to adults but never to infants. The principle of a rule of limitation of this kind, as set forth in the Hawaiian Statutes and elaborated in the Principles of the Land Commission, clearly is something like the following : that those who do not file their claims within the time limited either waive their rights and voluntarily give up their interests, or willfully or carelessly neglect and sacrifice them ; the failure to act, in either supposition, could only, by the weight of authority, prejudice adults ; infants not having the legal discretion to waive

their property interests or to sacrifice them through negligence, the control of their persons and property having been placed in their fathers' hands by the same act which created the Land Commission.

I have carefully examined all the authorities referred to by the plaintiff's counsel, and the opinions of the majority of the Court upon this point, and many other cases beside, without finding sufficient reasons for changing my views set forth in the decision appealed from.

The cases upon the status of infancy as affected by statutes of limitation, referred to with approval by the plaintiff's counsel, are : *Whittingham's Case,* Ewell's Leading Cases on Infancy, etc., 89 ; *Mills vs. Dennis,* 3 Johns. Ch., 368, and Ewell's Leading Cases, 234 ; *Hall vs. Bumstead,* 20 Pick., 8 ; *Beckford vs. Wade,* 17 Vesey, Jr., 87 ; *Bryan vs. Kennett,* 113 U. S., 179.

The cases referred to by the majority of the Court, in support of their conclusions upon this point, are :

*Hall vs. Bumstead* and *Beckford vs. Wade,* quoted by plaintiff's counsel, and *Demarest vs. Wynkoop,* 3 Johns. Ch., 129 ; *Bell vs. Morrison,* 1 Peters, 360 ; *Fisher vs. Harnden,* Paine Cir. Ct., 61 ; *McCluny vs. Silliman,* 3 Peters, 270 ; *Laanui vs. Puohu,* 2 Hawn., 162 ; *Kamehameha vs. Kahookano,* 2 Hawn., 118.

I find, upon examination, the following particulars and features of these cases which weaken their authority, in my mind, to affect the question at issue.

The citation in *Mills vs. Dennis* admits that a decree *in rem* may be reversed for error on account of infancy of the party in interest. The same case also contains the following words : " No laches can be imputed to an infant, and no valid decree can be awarded against him merely by default."

A note to the same case, page 235, says no decree can be taken against a minor on his own admissions or those of his guardian *ad litem,* (except perhaps, on admissions evidently for the benefit of the infant.)

In *Hall vs. Bumstead,* the allusions to minors' liabilities are in the nature of *obiter dicta.*

In *Beckford vs. Wade*, the question was whether the respondent was affected by the statute of limitations, she having been beyond the seas during the time the statute was claimed to have run. This statute was the possessory law of the Island of Jamaica (4th Geo. II.) The Court said: "It (the statute) does not bar legal remedies, if the parties do not proceed within a certain time; but it converts a possession for seven years under a deed or will, into a positive, absolute title against all the world;" and on page 90, "It is evident that absence from Jamaica contained no real disability to sue there; and so many proprietors are at all times absent from the Island that the purpose of the Act would have been in a great degree frustrated if the claims of such absent proprietors could at any time be made without any limitations or restriction;" and on page 91, "General words in a statute must receive a general construction unless you can find in the statute itself some ground for limiting and restraining their meaning by reasonable construction, and not by abitrary addition or retrenchment. I can easily refer to many cases in which such a construction ought to take place. One instance is furnished by the first Statute of Wills, the 32 Henry VIII., which declares that all and every person or persons may devise their lands by will; although no explanatory statute had ever passed, I should have thought there would have been no difficulty whatever in holding that this statute could not have enabled infants and persons of non-sane memory to devise by will; the obvious intention of the statute being to make a will a competent mode of conveying land, it could not be meant to make those capable of conveying by will who were not capable of conveying in any other way."

This is analogous to the question raised in the case before the Court, in which it is a fair argument to say that the Legislature, in passing an act which would deprive persons of valuable interests unless there should be an exercise of vigilance and diligence in the institution of proceedings requiring mature intelligence and experience, could not have intended that it should affect minors whose status in regard to restraint is set forth in the same act.

Perhaps the nearest approach to the position claimed in behalf of the plaintiff in regard to the liability of infants, is to be found in the case of *Bryan vs. Kennett*, in which it is laid down that the statute of Missouri of March 7th, 1835, which provides that non-residents of the State may be proceeded against in equity by publication, includes also non-resident minors, they not being excepted by the provisions of the statute; but it appears from the record of the case, that under the usual practice of the courts of chancery, the court had appointed a guardian *ad litem* to defend the suit for the non-resident minors; so that their position was in fact better than if they had been adults. This case does not therefore appear to be an authority for the contention of plaintiff's counsel.

The case of *Demarest vs. Wynkoop* is hardly in point upon this question. It came up under the New York Statute of Limitation of actions for possession of real estate, in which it is enacted that twenty years adverse possession will bar action unless the disability of infancy exists, in which case the infant is allowed ten years after termination of infancy. The plaintiff had failed to bring her action until the twenty years had expired, and also the ten years after the end of her minority; the question was whether or not she was entitled to twenty years after the expiration of her minority; the Court very properly decided that she was not, the statute having expressly provided for minors by a special allowance of ten years after removal of disability. The case, therefore, cannot be said to be in point to the issue before this Court.

Chancellor Kent, in his opinion in *Demarest vs. Wynkoop*, referred to the ancient case of *Stowell vs. Zouch*, which case contains the following: "Laches of suit or entry cannot be imputed to an infant whom God has not endowed with understanding or reason, for if he should take an action, his right and his action might be such as a writ of right and the like, which he could not prosecute nor compel the other party to answer during his non-age." (*Stowell vs. Zouch*, Plowden, 364.)

The case of *Bell vs. Morrison* has only the vaguest and most general application to the question at issue in this case. The law under consideration in that case was the statute limiting the time for bringing actions in assumpsit, and the question was whether or not the defendant had taken the case out of the statute and revived the cause of action by an acknowledgment or admission of his debt.

The Statute of Limitations referred to in the case of *Fisher vs. Harnden*, provides fully for the rights of minors, giving them five years after coming of age to bring their action; the case, however, did not turn on the rights of minors, but on the question whether the ancestor's title had been legally forfeited by a former judgment against him; and it was finally rendered useless as an authority by a judgment in error in the Supreme Court of the United States, in which the judgment of the Circuit Court was reversed and the case remanded for a new trial. *Harnden vs. Fisher*, 1 Wheaton, 300.)

The case of *McCluny vs. Silliman* was an action on the case against an officer for malfeasance; the defendant pleaded the Statute of Limitations of such actions, which plea was sustained. No issue or question of infancy was raised in the proceedings. The case, however, lays down a principle which certainly favors the defendant's contention in the case before the Court, to wit: "It is a well-settled principle that a statute of limitations is the law of forum, and operates upon all who submit themselves to its jurisdiction." An infant cannot be said to have submitted himself to its jurisdiction except through the action of a guardian acting for his benefit.

In *Laanui vs. Puohu*, the Court uses strong language in relation to the powers of guardians previous to the enactment of the Statute of Guardians and Wards of 1851. It says "they possessed and exercised (by the common law of the Kingdom) the absolute right to dispose of the real and personal estate of their wards as might suit their own will." This, however, cannot be interpreted to mean that they might exercise such powers to the injury of their wards; the disposition of the property by the

guardian, disputed in that case, was a reasonable transfer of a certain part of the estate as settlement of rights of dower; it was undoubtedly a benefit to the wards' estate to have such rights settled in the way it was done. If it was an important matter to this discussion to question the correctness of the last quotation, it might be done by reference to Section 54 of the above-mentioned Act of 1851 (Civil Code, Section 1395), which legalizes all previous sales and transfers by guardians of their ward's property; surely if such transfers were already legal "by the common law of the Kingdom," the Legislature could hardly have considered it necessary to legalize them by statute; moreover, the case of *Laanui vs. Puohu* applies to statutory guardians, that being the capacity of the guardian whose acts were questioned in the case; and there is nothing to show that the Court intended to include natural guardians or parents in its statements of the powers of guardians.

The case of *Kamehameha vs. Kahookano* at first sight has the appearance of being an authority for the right of a natural guardian to injuriously dispose of his minor child's estate previous to the Act of 1851; but, upon examination, I find that it was the legalizing Act above referred to which led the Court to its conclusions. It says: "Any grant of right of way over the plaintiff's land, or any conveyance whatever of any part of his estate, made by Governor Kekuanaoa during the plaintiff's minority, and before the enactment of Section 54 of the 'Act Regulating Guardians and Wards' (Civil Code, Section 1395), passed on the fourth day of August, 1851, must be considered absolutely conclusive and binding upon the rights of the plaintiff." If I am right in this view, the case has no significance whatever to the present issue, as the legalizing Act of 1851 cannot by any stress of argument be said to effectuate all previous non-performance, neglect or mismanagement of guardians as the non-performance, neglect or mismanagement of their infant wards.

*Whittingham's Case* does not appear to have any direct application to the question at issue.

I have found, on the other hand, cases which support the doctrines that a minor may not be prejudiced in his rights of property in any proceedings in which he is not represented, and that a guardian may not injuriously affect his minor ward's interests by admissions or negligence.

It is not possible "to preclude the minor heirs from asserting their rights to property received from their father, by reason of any negligence of their guardian. * * * There is no circumstance here upon which an estoppel against the plaintiffs can be raised. To create an estoppel against them there must have been some act or declaration indicating an authorization of the use of their names, by which the company was misled, or a subsequent approval of their use by acceptance of the moneys received with the knowledge of the transfer. No act or declaration is mentioned, either of the guardian or her children, which tends in the slightest degree to show that any assent was given to the use of their names." (*Telegraph Company vs. Davenport*, 97 U. S., 373.)

"Where infants are deprived of apparent rights by a decree of Court, they have the power, in a new action, to attack it, and this too whether or not they were made parties to the first suit." (*Joyce vs. Joyce*, 5 Cal., 161, syllabus, and *Bank of United States vs. Ritchie*, 8 Pet., 128.)

In *Joyce vs. Joyce*, the guardian *ad litem* fraudulently confessed a bill in equity against the rights of the minor defendants.

In the case of *Valier et al.*, plaintiffs in error, *vs. Hart et al.*, defendants in error (11 Mass., 299), the error assigned was the minority of one of the original defendants. The defendants in error moved to quash the writ on the ground that an appeal lay from the Justice's judgment to the Court of Common Pleas, and that where an appeal lies, error does not lie, and cited *Savage in error vs. Gulliver* (4 Mass., 171). The Court said : " The very minority of the party, which is assigned for error in this case, and which is not denied, disabled him from appealing. The decision in the case cited in support of the motion is very guarded, limiting it to cases where the party may appeal, and

the Court explicitly state their opinion that the statute, in giving an appeal, has not taken away the remedy by error in cases where the aggrieved party, without any laches on his part, cannot avail himself of an appeal, which it is very clear an infant cannot."

If an infant cannot avail himself of an appeal, much less can he institute original proceedings, nor can he force his guardian to do so.

"Infants cannot be in default in the sense that their rights may be adjudged away without affirmatively showing that it is equitable and just. The record must contain enough in such cases to sustain the decree, whether guardian *ad litem* answers or not." (*Materson vs. Wiswould*, 18 Ill., 49.)

In the case of *Cost vs. Rose*, 17 Ill., 275, a default was taken as to all of the defendants, some of whom were infants, and the Court upon writ of error say, "they being infants, no default should have been taken against them."

"A judgment rendered against an infant for whom no guardian *ad litem* has been appointed, is liable to be reversed by writ of error." *Crockett vs. Drew*, 5 Gray, 399, and *Wells vs. Wells*, 6 Ind., 447.)

"In this (the instruction that the plaintiff's claim was barred by the statute) we think the Court erred, because the claim of the plaintiff is not embraced by that statute. It does not and never was intended that it should apply to claims for the recovery of which the party entitled thereto could not maintain an action. The statute does not extinguish the debt or claim; it only forms a bar to the remedy of the party to recover it by action; but it is perfectly clear that if the right to maintain an action for it were never vested in him, the statute can be no bar to it, because it would be contrary to reason to hold that the statute operated upon and took that away which never existed." (*Leasure vs. Mahoning Township*, 8 Watts, 55, and Angel on Lim., 59.)

In relation to the contention that no disability not mentioned in the Statute of Limitations may be considered, I find a con-

trary doctrine held by *Hopkins vs. Bell*, 3 Cranch, 454; *Hanger vs. Abbott*, 6 Wall., 532; and *Braun vs. Sauerwein*, 10 Wall., 222, besides several similar cases in the State Courts. The Court say in *Braun vs. Sauerwein;* "the creditor has been disabled to sue by a superior power, without any default of his own, * * * none of the reasons which induced the enactment of the statutes apply to his case; that unless the statutes cease to run during the continuance of the supervening disability, he is deprived of a portion of the time within which the law contemplated he might sue. It seems, therefore, to be established that the running of a statute of limitations may be suspended by causes not mentioned in the statute itself." These words without modification might have referred to the status of an infant so far as intrinsic evidence goes; as a matter of fact, they referred to the case of a creditor who was prevented from suing by the American Civil War.

The case of *Vance vs. Vance*, 108 U. S., 521, and *Pryor vs. Ryburn*, 16 Ark., 671, have some appearance of being in opposition to my views on this point; but in the former it is shown that the minor is reasonably protected by the statute which makes it the duty of an officer of the Court to act for him. The case of *Pryor vs. Ryburn* I have not been able to find except in digests.

In view of all the foregoing cases, I find my original opinion upon this point rather strengthened than otherwise. Not a single case has been referred to in which an infant's rights have been diposed of as it is proposed to do in this case; it is reasonable to suggest that there are no such cases on record. I find no authority to support the view that Hawaiian guardians or parents, before the Act of 1851, might injuriously affect the ward's estates, except as injurious transfers might have been legalized by that Act; and I think that under its legalizing provisions I may safely dissent from the argument that "if the law was that all acts of a guardian or a father respecting the disposition of an infant's property bound the infant, his failure to present a claim for land is an act, the consequences of which would be equally binding upon the infant."

But it is suggested that even if Lot Kamehameha was not bound by the limitations of the statute during his minority, "it was his duty to assert his claim to this land within a reasonable time after his coming to full age." It must be borne in mind that the time in which the Land Commission had authority to receive claims had expired before Lot Kamehameha became of age. What use, then, would it have been for him to present his claim when the Land Commission had ceased to exist as a committee for receiving claims? No court would have issued a mandamus to compel the Land Commission to do what was not their duty, and what they had no power to do, unless they should be thereto duly authorized by the Legislature; and it is too much to demand that, under the circumstances, it was necessary that Lot Kamehameha should set in motion the uncertain and unwieldly machinery of legislation in order to protect his interest. He asserted his interest in the land so far as was in his power by continuing to occupy the premises.

I do not think that it is claimed that his interest in the premises has ripened into a perfect title, but there has been no valid forfeiture of his interest whereby the Government has acquired a right of possession. He and his representatives are entitled to their "day in court," that is, their opportunity to present and prove their claim before the Land Commission, or a similarly constituted authority; they have never had such opportunity.

Justice and equity and the prevailing sentiment of legal decisions, under common law principles through a long period, alike forbid the destruction or injury of the rights or estate of infants, except through legal proceedings in which, beyond any doubt, they are fully and faithfully represented.

Not finding in this case as presented any evidence to show that the natural guardian of Lot Kamehameha took any action whatever in the way of proving his son's claim to the premises in question, it is fair to presume that he was guilty of laches, which conduct cannot prejudice his minor child.

From the foregoing authorities and reasoning, I am compelled to dissent from the opinions of the majority of the Court, and to hold as before, that the plaintiff has not shown a right of possession to the disputed premises.

N.B.—An *Ili* is a subdivision of land. *Mahele* means division; in this connection it means the great division of lands made in 1848 between the Kings, chiefs and people.