## ESTATE OF HER ROYAL HIGHNESS KEKAULUOHI,

### Deceased.

IN PROBATE.   BEFORE JUDD, J.

### MARCH, 1876.

To authorize probate of a lost will by parol proof of its contents, the evidence must be strong, positive and free from all doubt.

The effect and history of "Kauohas" considered, with reference to ancient Hawaiian law and custom.

An award of the Land Commission, made after the date of an alleged lost will, is conclusive against the right to prove such will now, if the will differs from the award.

Probate refused.

### DECISION OF JUDD, J.

This is an application by H. H. Chas. Kanaina, for the probate of the will of Her late Highness M. Kekauluohi, Premier, alleging that said will was destroyed after her death, and praying that it be established upon proof of its contents. It is proved that Her Highness died on the 7th June, 1845; that

she left an only son, William Charles Lunalilo, who became King in 1873 and who died in 1874, devising his property to the petitioner, his father. The following is the will sought to be established as propounded in the petition:— ·

1. I bequeath all the estate formerly of Kaikioewa, to Moses, son of Kinau and Kekuanaoa.

2. I bequeath all the estate formerly of Hoapilikane, to Lot, son of Kinau and Kekuanaoa.

3. The estate of Kinau is to go to Victoria Kamamalu, the daughter of Kinau and Kekuanaoa.

4. I bequeath all my own estate held in my own right to my own son Lunalilo.

5. That if Moses or Lot should die before Victoria Kamamalu, then she shall inherit their property.

6. That if Lunalilo should die first, then the children of Kinau shall inherit his property.

7. That if Moses, Lot, and Victoria Kamamalu should die before Lunalilo, then he shall inherit all their property hereby bequeathed.

8. That Alexander Liholiho, son of Kinau and Kekuanaoa, was to take nothing as he was to inherit the throne.

Four witnesses have been examined to establish this will, viz: Auwai, Kilinahe, Kamaipuupaa (w.), and S. M. Kamakau; the three former claim to have been present at its execution; but before considering their testimony it is necessary to examine the principles of law applicable to the proof of lost wills.

It is laid down by Swinburne, and adopted by later text writers, "that if a testament be made in writing, and afterwards lost by some casualty, if there be two unexceptionable witnesses who did see and read the instrument written, and do remember the contents thereof, the two witnesses so deposing to the tenor of the will are sufficient for the proof thereof in form of law:" and

In 1 Williams on Executors, p. 312, the following comment is made: "And, at this day, it is quite clear that the contents or substance of a testamentary instrument may be thus

established, though the instrument itself cannot be produced, upon satisfactory proof being given that the instrument was duly made by the testator, and was not revoked by him, for example, either by showing that the instrument existed after the testator's death, or that it was destroyed in his lifetime without his privity or consent."

The following is the note to Redfield on the law of Wills, p. 348: "The practice of the American Courts of receiving parol evidence of the contents of a lost will, seems to be universal, and without question, notwithstanding the stringent statute requirements in regard to the mode of executing wills, and a lost will may be established by the testimony of a single witness, notwithstanding the statute requires the execution in the presence of two or more. But this evidence must come from witnesses who have read the will and whose recollection of its contents is trustworthy."

In *Davis et al. vs. Sigourney,* 8 Met., 489, Wilde, J., says: "To authorize the probate of a lost will by parol proof of its contents depending upon the recollection of witnesses, the evidence must be strong, positive, and free from all doubt. Courts are bound to consider such evidence with great caution, and they cannot act on probabilities." In this case the witness was the attorney who drafted the will, but as he could not testify with absolute certainty as to some parts of it, the Court refused to establish it.

None of the witnesses produced in this case at bar ever read the will. Auwai says he heard the King read it before signing it; Kilinahe says Kuluwailehua read it, and he also says that the King read it; and S. M. Kamakau says that he heard it read in the Legislative Council after the Premier's death; Kamaipuupaa says she heard it read in the presence of the testator. A strict ruling would fully justify the refusal of the probate of the will on the ground suggested, that is, that no one witness testifies from actual recollection of its contents, but from recollection of what was said to be its contents by the reader. The fact, however, that the King was the reader, as

testified to by one witness, would repel the possibility of a motive for a false reading of it to the testator (herself the highest chief then living), and it having an important bearing as a state document; and I, therefore, in view of the peculiar circumstances of this case, do not rule that the witnesses must have actually read this will in order to be allowed to testify as to its contents.

Let us see, however, if the evidence bears the test of being "strong, positive, and free from all doubt."

Auwai says the will was made one month before Kekauluohi died, and that it was signed three or four days before her death in the presence of the King, John Young, and the young chiefs, who were sent for from school, and that Kamehameha III. and John Young then signed it.

Kilinahe says the young chiefs were not present, and that the King and Mr. Young signed it a few days after the testator signed it, and that she died a few weeks after signing it; Auwai, Kilinahe, and Kamakau agree that the will left the property of Kaikioewa to Moses, the property of Hoapilikane to Lot, and her own property to her son Lunalilo; Auwai and Kilinahe agree that the will left the property of Kinau to Victoria, and Kamakau says that it left the estate of her own family to Victoria and Lunalilo, that is, that Lunalilo and Victoria were to divide the family (or Kinau) property equally, but that her own property was to go to her own son. Auwai says that the will directed as follows: "Regarding Moses, Lot and Victoria, if either of them die the others were to inherit, and if Lunalilo died first they were to inherit." He adds that when Kamehameha III. came in "Kekauluohi told him that if Moses, Lot and Victoria died, then Lunalilo was to inherit," but he does not assert that the will contained these words.

Kilinahe says the will provided that if either Moses, Lot or Victoria died, then each would inherit from the other; if they all died before Lunalilo, he would inherit all; if Lunalilo died first, they would inherit.

Kamakau says that if any one (of the four) died, the others would inherit; if all but one died, he would inherit.

The above statments of the recollection of the different witnesses vary so essentially from each other, that I am at a loss to say what were the actual terms of the will, and I do not feel at liberty to cull out the testimony where it happens to coincide, and from these fragments frame a will. Using the caution which Courts are bound to exercise in such cases, I cannot act upon the probability that the recollection of Kilinahe and Auwai, servants of the family, are any more likely to be trustworthy than that of Kamakau the historian, whose learning is certainly greater than that of the other two.

Here I must allude to the testimony of Kamaipuupaa, who, while present at the signing in the presence of the King, states that the will left the property of the testator to her son Lunalilo, and that he was the only one mentioned in her will, and that she did not hear any other property mentioned.

Over thirty years have elapsed since the alleged transaction; every one of the parties mentioned and interested in the will propounded have passed away from earth. As a matter of fact, the Land Commission which was organized the same year (1845), did award to Moses the lands of Kaikioewa; to Lot, the lands of Hoapilikane; to Victoria, the lands of Kinau; and to Lunalilo, the lands of Kekauluohi; and they were awarded by distinct titles to the different individuals and "their heirs and assigns," and with no limitation over to the survivor or survivors, as sought to be established by the will. Such a limitation of entailing of these vast estates would be inconsistent with the right of alienation, a right, however, freely enjoyed by all of the above-named young chiefs or their guardians, without objection by the others or their survivors.

It may be objected to, however, that this a proceeding merely to admit a will to probate, not to determine the right of property under it, but I consider the *restrictions* and *terms* of a will as fair matter of comment upon the question of the proof of a lost will, for if they are absurd in themselves, it is a fair inference that they were not in the will. For instance, further, the right assumed by the testator, as claimed in the will propounded, to

devised as her own the property confessedly another's, as the property of Kaikioewa to Lot, is certainly absurd when it is claimed to have any testamentary effect.

Reference, however, to Hawaiian history will show us that such "kauohas" or directions made by a high chief in the expectation of death were highly regarded, and as in the nature of advice, which were given effect according as the King, after discussion with the chiefs, considered the instructions to be reasonable, and such a "kauoha" was equally regarded whether purely oral or reduced to writing.

This leads me to a point made by the counsel for the contestant, that is, that if it be admitted that the contents of the will are shown, this will has been already proved by a court of competent jurisdiction, as it was presented to the Legislative Council in 1845, and, as testified to by Kamakau, "its provisions were carried out," which corresponds to what is now known as admitting a will to probate.

The law on the subject was the Act of 24th of April, 1841, "Respecting parental duties." "When he (the parent) dies, the heir shall exhibit the will to the King, and if the Supreme Judges perceive there was a real fault in the will, they shall correct it," etc.

The Supreme Judges were, by the Constitution of October 8th, 1840, the King, the Premier, and four persons chosen by the Representatives, but I find that in 1845, M. Kekuanaoa, then Governor of Oahu, and Judge of the Court of Oahu, admitted wills to probate. (*Vide Polynesian*, 1845, Proof of Will of Thomas Pratt.)

It is my opinion that this kauoha of Kekauluohi was not regarded as having any effect as a testament, except so far as it left her own property to Lunalilo, and it was unnecessary for this purpose, for she had but one son and heir, Lunalilo, and it could have no effect, other than as good advice, in passing the lands of Kinau to Victoria, or those of Hoapilikane to Lot, etc.

It was not strictly "admitted to probate," in the Legislative Council of chiefs, as contended for, but it was discussed there,

12

and carried into effect so far as was deemed advisable, that is, the sentiment prevailed that the young chiefs mentioned should inherit the lands from their respective parents and foster parents as indicated.

In one sense, however, it was admitted to probate, for the only judicial action necessary to be taken upon it was taken, and I fail to find anything in the whole transaction that bears out the idea that this kauoha had the *entailing* clauses in it, as propounded in the petition; but if it did contain them, the King and Council set them aside, for these were never carried out.

That the Legislative Council did settle or take action upon the property of high chiefs is clear, for the *Elele Hawaii* newspaper of June 3, 1845, contains a notice of the settlement by the Legislature of the property of Governor John Adams (Kuakini); by which they determined that his private property should go to his heir Leleiohoku, in accordance with his kauoha (will), and that his cash $20,000 should go to Kekauluohi, Kamehameha III., and the young chiefs Liholiho, Lot, Moses and Victoria. Also, notice of the settlement of the property of Haalilio by the Legislature, that it should go to the King as his heir, and that the King should give Haalilio's mother $20 per month during her life.

I refer to these newspaper accounts, in default of the records themselves, which counsel, after search, were unable to find.

The *Polynesian* of June 21, 1845, in an obituary notice of the deceased Premier, says that "she had a large amount of property in her hands, the most of which she held as guardian for her niece, Victoria Kamamalu. Her own estate, however, was considerable, the whole of which she bequeathed to her son."

But the Land Commission was authorized by law to "investigate, confirm or reject all claims to land arising previously to the tenth day of December, 1845," and as the will in this case vested the property at the date of the death of the testator (the 7th of June, 1845), the action of this Commission in awarding the lands as mentioned above without the entail to the survivors is conclusive against the right to prove a will *now* which would divert the property differently than awarded.

Their action was a judgment of a Court of competent authority. upon a matter within its jurisdiction, it being a "claim. for land arising previously to December 10, 1845." *Kanaina vs. Long,* 3 Hawn., 332; *Kahoomana vs. Minister of Interior, Ib.* 635.

But the case of *Estate of Kaniu,* 2 Hawn., 82, is referred to by the counsel for the petitioner. In this case Justice Robertson admitted a verbal will to probate, made in 1843, and although the land the testator had had been awarded to Kinimaka, and not to the devisee. I cannot believe that the attention of the learned Justice was called to this point, or he would not have thus practically set aside an award of the Land Commission of which Board he was a member.

For the foregoing reasons my judgment is, that the will of Kekauluohi, as propounded in the petition, be refused probate.

*W. C. Jones,* for petitioner.
*E. Preston,* for contestant.
Honolulu, March 31, 1876.