# KAPIOLANI ESTATE, LIMITED, v. MARY H. ATCH-ERLEY, LYLE A. DICKEY AND EDWARD M. WAT-SON.

### APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

ARGUED FEBRUARY 3, 1913.                    DECIDED MARCH 3, 1913.

### ROBERTSON, C.J., PERRY AND DE BOLT, JJ.

STARE DECISIS—*decisions of courts of last resort binding on inferior tribunals.*

The decisions of a court of last resort are binding upon all tribunals inferior to it. Held, accordingly, that a decision made by the supreme court of the United States following the opinion of the supreme court of Hawaii upon a matter of local law is binding upon this court in another case notwithstanding the belief of this court that its former opinion was wrong.

### OPINION OF THE COURT BY ROBERTSON, C.J.

#### (Perry, J., Dissenting in Part).

This is a bill to declare a trust, to direct a conveyance, and for an injunction against the prosecution of an action at law. The defendants appeal from a decree entered granting the relief prayed for.

It will be necessary in order to properly understand the case to refer to the former decision in this case reported in 14 Haw. 651, and to the cases of *Atcherley* v. *Lewers & Cooke,* 18 Haw. 625, and *In re Lewers & Cooke,* 19 Haw. 47 and 334; and to the report of the same case on appeal, *Lewers & Cooke* v. *Atcherley,* 222 U. S. 285.

Since this case was last before this court Lyle A. Dickey and Edward M. Watson have been joined as parties defendant, Mrs. Atcherley having executed a deed purporting to convey to them an interest in the land in dispute.

Without repeating in detail the facts and circumstances which led up to the controversy between these parties and have brought it again to the attention of this court it may be well to refer

to those matters which may properly be regarded as the leading features of this litigation.

In so far as rights of property in land existed and were recognized in these Islands prior to the establishment of the land commission, the chiefess Kaniu was the owner of the land in dispute when she gave it by oral will, which later was duly proven in court, to her foster son, David Kalakaua, a boy about seven or eight years of age; that by the same will the husband, Kinimaka, was made the testamentary guardian of the child to "take charge" of the land for him; that upon the establishment of the land commission Kinimaka presented a claim in his own right and received an award of this and other land in his own name. On reaching the age of majority Kalakaua, on December 30th, 1856, brought suit in equity against Kinimaka seeking to have the defendant declared to be a trustee for the plaintiff and to compel a conveyance to him of certain lands, including the land in dispute; that Kinimaka died without having filed an answer in the cause; that a new suit was commenced against the widow and minor children (by his second wife) of Kinimaka; this suit was contested by the widow and the duly appointed guardian of the minor defendants, testimony was taken, and the case proceeded to a point where the plaintiff filed a discontinuance except as to the land in dispute and one other piece, it being recited in the discontinuance that the plaintiff, "in consideration of certain sums of money paid by Kinimaka during his lifetime, for his (plaintiff's) use and benefit, relinquishes all right to any and all land now included in the Estate of said Kinimaka, and set forth in the petition in the above entitled cause, and discontinue my action for the same, saving and excepting" two lands; that on the same day a decree was entered in the cause directing Armstrong as guardian of the three children to convey to the plaintiff the two lands referred to; and that the conveyance so directed to be made seems never to have been executed. Had the entry of that decree been followed by the conveyance to Kalakaua of the lands in question

it is probable that this litigation would not have occurred. Whether Kinimaka took the award of this land in his own name in wilful fraud of the right of his ward or in ignorance of those rights and under the belief of the validity of his own claim probably will never be known, and it is impossible to say at this time whether the decree made by Chief Justice Allen in 1858 was entered pursuant to a compromise entered into by the parties, or whether it resulted from a realization on the part of the guardian of the infant defendants and his counsel of the justness of Kalakaua's claim and an unwillingness on their part to attempt the further maintenance of a position at least morally untenable, whatever might be said of the legel aspect of the affair, or otherwise. The record shows that "Mr. Bates (attorney for Pai and Armstrong) admitted that at the time of making the will the whole property was given to David (Kalakaua), that at the time of her (Kaniu's) death she said to her husband (Kinimaka), standing by at the time, that she wished him to take charge of all her property which she had willed to David." It is quite clear that the entry of a decree in favor of the defendants in the suit of 1858 would have perpetrated an injustice on Kalakaua. To the limited and qualified extent that lands were the subject of private ownership before the creation of the land commission the land in question belonged to Kalakaua; it was his right to apply for an award of title; that right was protected by constitutional guaranty; and it was the duty of his guardian to make application for a title in his behalf; but Kalakaua was deprived of the land without his consent. Perhaps it was supposed that the decree entered by Chief Justice Allen in *Kalakaua* v. *Pai and Armstrong* in 1858 was self-executing and binding on all the defendants, and that the making of a deed was unnecessary, at any rate the parties in interest acquiesced in the decree, and Kalakaua and those claiming under him remained in undisturbed possession of the premises until Mary H. Atcherley, who had obtained a deed from Moses Kapaakea Kinimaka, brought ejectment against the Ka-

piolani Estate, Limited, and others on July 31st, 1901. This court (14 Haw. 651) reversed a decree sustaining a demurrer to a bill for an injunction against the maintenance of the eject-ment case. It was then held that the decree of 1858 was not ambiguous; that it directed the conveyance to the plaintiff of the minor defendants' interests in the land in dispute; that there was not a lack of jurisdiction over the parties; that the decree was not void for any reason then advanced; that the attack on the decree was a collateral attack; that it was not a consent decree; and that while the court had power to examine into the propriety of the decree it would not, under the circumstances, do so. In the *Lewers & Cooke* case, 18 Haw. 625, this court said that the decree of 1858 "has all the appearances of a com-promise decree, consented to by the guardian of minors" (p. 639) but declined to review the ruling made in 14 Haw. 651, that that was not a consent decree, but held that "an additional point not decided in the proceedings on demurrer is decisive against the right of the petitioners to a registered title, which would be substantially an enforcement of the decree of 1858" (18 Haw. 632), the point referred to being that the award of the land commission in favor of Kinimaka, being final and con-clusive, was binding on Kalakaua and the decree of 1858 was, therefore, erroneous, if not void. The suit before Chief Jus-tice Allen was regarded as an attack upon the judgment of the land commission, the court saying, "If this court, therefore, shall enforce the decree of 1858, or by registering the title of the petitioner treat the decree as enforceable, it will be the first time in the judicial history of Hawaii that a land commission award shall have been *set aside* upon any pretext whatever" (18 Haw. 638). The criticism of the language used in the opinion in the case of *Estate of Kaniu,* 2 Haw. 82, made in *Estate of Kekauluohi,* 6 Haw. 172, was approved, although it was con-ceded that "the actual decision of that case was not in conflict with the principles above cited, for the estate of Kaniu consisted of personal as well as real property, and the decision was to ad-

mit the will to probate" (18 Haw. 638). It was held that the title to the land, equitable and legal, was in Mary H. Atcherley, and the decree of the court of land registration registering the title of Lewers & Cooke, Limited, was reversed. In denying a petition for a rehearing of that case (19 Haw. 47), it was held that the decree of 1858 was not controlling under the doctrine of *stare decisis* as that doctrine "is applied only when the rights of innocent purchasers for value have intervened as to the particular property;" it was said that there had been "no reversal of any findings of fact of the court of land registration;" and as to the case in 14 Haw., it was pointed out that, as a decision on demurrer, it was "by no means conclusive as predicting the final determination of the case," and the court was of the opinion that the case was not overruled. Then followed the entry in the court of land registration of a decree denying the petition of Lewers & Cooke, Limited, and upon appeal from that decree this court made a decree denying the petition without prejudice to the petitioner's right to obtain a registered title to other land which was included in the petition. On appeal to the supreme court of the United States the decree was affirmed.

Notwithstanding the statement made in the *Lewers & Cooke* case (19 Haw. 48) that there had been no reversal of the facts found by the court of land registration, the fact found by that court that Kinimaka "was the natural guardian of the minor" was not included in the findings of fact certified up by this court on the appeal to the United States supreme court. And the fact that the guardianship relation existed, vitally important though it was, seems to have received scant consideration in that case. That Kinimaka was the testamentary guardian of Kalakaua's property seems to be beyond the range of dispute at this time. If the relation existed in fact a question as to the regularity of the appointment would not prevent the assertion of any rights the ward would otherwise have against the guardian. "It is not essential that a legal guardianship

should exist; the doctrine (constructive fraud) applies wherever the relation subsists in fact." 2 Pom. Eq. Jur. Sec. 961.

We are satisfied that this court fell into error in the *Lewers & Cooke* case in taking the view that the equity suit before Chief Justice Allen constituted an attack on the award of the land commission and that the decree in that suit amounted to a setting aside of the award. None of the prior decisions in this jurisdiction which were cited in support of the view taken are authority for the conclusion reached, as an examination of them will show.

*Kukiiahu* v. *Gill,* 1 Haw. 54. That was an action of trespass upon land. The defendant claimed under a royal patent dated in 1849 and an anterior deed from one Kalua. Plaintiff claimed under a royal patent dated in 1850 which was based on a land commission award. As to the merits of the respective claims under the patents, it was pointed out that that of the defendant was subject to the rights of natives and, therefore, subject to the plaintiff's title under his award. And as to the claim under the deed of Kalua it was shown that both the plaintiff and Kalua were claimants for the land before the land commission and that the contest was decided in favor of the plaintiff. It was the judgment of the land commission in that contest that resulted in the award to the plaintiff, and it was that judgment, which under the law was final unless reversed on appeal to the supreme court, there having been no such appeal, that was held could not be reopened on the allegation that the plaintiff had prevailed before the land commission upon false testimony. It was an attempt to show in an action at law that the award of the land commission was erroneous.

*Kalakaua* v. *Keaweamahi,* 4 Haw. 577. In that case the plaintiffs sought relief in equity because of fraud alleged to have been committed by defendants' ancestor upon the ancestor of plaintiffs' grantor. The case was heard upon bill and demurrer. It appeared that one Kaunuohua (under whom plaintiffs claimed) who was the wife of Moehonua (under whom defendants

claimed) made claim for certain land before the land commission and died pending action by the commission; that after her death the lands were awarded to Moehonua (Kaunuohua for Moehonua); it was alleged that no new proofs were taken by the land commission after Kaunuohua's death; and it was contended that the award was made as it was through Moehonua's fraud.

The court held it could not assume that the land commission had no authority for issuing the award in the form in which it was issued, and that the failure to record evidence to sustain the award would not vitiate it. Other points were involved. The demurrer was sustained with leave to amend. In that case also it was attempted to show that the award was erroneous. A review of the proceedings of the land commission was sought. If Kaunuohua's heirs, who, it must be assumed were *sui juris,* appeared and contested the matter with Moehonua, the decision of the land commission against them was conclusive in the collateral proceeding, and if they did not contest with Moehonua they were in default and the award was equally conclusive. Their only possible remedy was by appeal from the judgment of the land commission.

*Kaai* v. *Mahuka,* 5 Haw. 354. That was a bill to declare a trust, but there was no element of trust involved. It seems that two brothers, Mahuka and Kaai, were entitled to an award of land in common; that Mahuka presented a claim for the land to the land commission in his own name, and at the hearing admitted that his brother had an equal right with him; that the award was headed "Mahuka and Kaai" but the grant was to Mahuka alone. The learned chancellor said that Kaai "may have, for all we know, relinquished his claim by an unrecorded deed now lost. It is to be presumed that he was aware of the award to Mahuka alone, and that he consented to it." Clearly, if Kaai had any fault to find with the award it was for him to follow the remedy which the law gave him by appealing to the supreme court.

That it was an attempt to correct a supposed error of the land commission which involved an attack on the judgment is shown by the remark made by this court that "Every year which passes increases the force of the reason which demands that the adjudications of the land commission be not now re-examined."

*Estate of Kekauluohi,* 6 Haw. 172.   That was a petition in probate to establish a lost will before Mr. Justice Judd in 1876. After holding that the contents of the will, which, it was claimed, devised certain lands, some of which the testatrix owned and some she did not own, had not been proven, the learned justice pointed out that the fact that the will must have taken effect upon the death of the testatrix, June 7th, 1845, furnished a basis for claims for land "arising previously to the tenth day of December, 1845," which should have been, and, it seems, in fact were, presented to the land commission for confirmation, furnished an additional reason for refusing the application.

*Thurston* v. *Bishop,* 7 Haw. 421.   That was an action of ejectment instituted by the minister of the interior of the Hawaiian Kingdom against the trustees of the estate of B. P. Bishop, deceased, to recover certain land.held by the defendants. The plaintiff claimed that as the land had not been awarded by the land commission or granted by the government the title was in the government.   The court found that the sole question involved was whether Lot Kamehameha, from whom the defendants claimed, was barred of his rights in the land (it being conceded that he would have been entitled to an award of the land had his claim been presented) by reason of his own or any one's failure to present the claim within the time required by law to the land commission, Lot Kamehameha being a minor.   The question was answered in the affirmative.   It was held that it was the duty of the minor's guardian (his father) to have made claim for the land on behalf of his ward and that his failure so to do was binding on the minor.

The question now presented is whether a minor on coming of age could obtain relief in equity against a guardian who had,

Kapiolani Estate v. Atcherley, 21 Haw. 441.

in fraud of his ward, presented a claim and obtained in his own name an award from the land commission of title to the minor's land. This question was neither involved nor discussed in any of those cases.

The case of the guardian of a minor obtaining an award in his own name of land belonging to his ward is analogous to the case of a guardian who purchases land with money belonging to the ward and, in violation of his fiduciary duty, intentional or otherwise, takes the title in his own name. In such a case, it is well settled, equity, regarding the land as being the property of the ward, will declare and enforce a constructive trust in favor of the ward and order the conveyance of the legal title. 3 Pom. Eq. Jur. Secs. 1052, 1058.

Where, as was shown in the case of *Kalakaua* v. *Pai and Armstrong,* an award of land had been obtained by the guardian during the ward's minority, and the ward had asserted his right without delay after coming of age by instituting suit against the guardian and, upon his death, his widow and devisees, the appropriate relief, if complainant was entitled to relief, undoubtedly would be a declaration of trust and an order to convey the legal title. The bill of complaint in that case alleged the death, testate, of Kaniu in 1843; the devise to the complainant who at that time was an infant; the designation of Kinimaka as testamentary guardian of the property of the complainant; the discovery, on complainant's coming of age, that his guardian had fraudulently procured certain awards of lands in his own name; the admission of Kaniu's will to probate; the title to the lands in Kinimaka in trust for the use and benefit of the complainant; the death of Kinimaka in 1857, leaving a widow and three children; and that the procuring of said awards by Kinimaka in his own name was contrary to equity and good conscience. The complainant prayed for a decree declaring that Kinimaka procured the awards and held possession of the lands for the use and benefit of the complainant; that the widow and the guardian of the children be ordered to convey all their

right, title and interest in said lands to the complainant; and for further relief. Counsel for the appellants contend that the fact that at the hearing in that suit the complainant put in evidence the record of the land commission in the matter of Kinimaka's application shows that a review of the proceedings before the commission was attempted. We do not accept that view. That record was properly adduced to show that Kalakaua's claim had not been presented to the land commission. The theory upon which the suit proceeded and the object aimed at preclude the notion that it was desired to have the award to Kinimaka set aside or annulled. The upholding of the award was essential to the success of Kalakaua's suit. To attack and set aside the award would have been to take from Kinimaka's representatives the very title which the complainant was seeking to compel them to convey to him.

If A, by fraud, obtains a judgment against B, B may obtain equitable relief against the enforcement of the judgment by showing the fraud and asking equity to intervene because of it. Broadly speaking it may be called an attack on the judgment though equity acts *in personam*. But if A obtains a valid judgment against B and secures the fruits of that judgment, and by reason of A's relation to C, A is the constructive trustee for C of those fruits, C may proceed in equity to take them from A. The suit of C against A clearly would not constitute an attack on the judgment against B, but would assume and maintain its validity. Such is the case here. The suit before Chief Justice Allen was not an attack on the award of the land commission; it was not an attempt to review the proceedings of the land commission or to correct or set aside the award to Kinimaka. On the contrary, it assumed the correctness of the judgment of the land commission and the validity of the award. It was an entirely new proceeding based upon the assertion that the legal title to the land was vested in Kinimaka and his heirs by and under a valid award issued by the land commission, but that because of the other facts averred, the defendants held as con-

structive trustees for the benefit of the plaintiff. Furthermore, the new proceeding sought to assert a right which had accrued to the complainant since the date of the award to Kinimaka, namely, the right of a minor, upon his reaching his majority, to demand of his guardian a full and true report of his acts with reference to the trust property, an honest accounting of all thereof, and a conveyance of such of it as stood in the guardian's own name. If Kinimaka had failed to present any claim for this land to the land commission either on behalf of his ward or in his own name no title would have been acquired. *Thurston* v. *Bishop,* supra. Kalakaua could not have followed the property because it would then have been beyond reach. But having obtained the award, Kinimaka, or those claiming under him, could not be allowed to say that the claim of Kalakaua had been litigated and disapproved by the land commission either on the theory that Kinimaka based his claim on an alleged gift from Liliha, or otherwise. Kalakaua's claim to this land as against Kinimaka was not presented to the land commission and, consequently, was never passed upon by that tribunal, but that could not be attributed to any fault or neglect on the part of Kalakaua. There is an unmistakable analogy between the right of Kalakaua to the relief sought by him in the suit before Chief Justice Allen and the right of one to an injunction or other relief in equity against a judgment at law fraudulently obtained where the circumstances were such that the fraud could not have been shown in defense of the action. Such a case ordinarily is not regarded as an attack upon the judgment or a review of the proceedings had in the law action, but as the assertion and recognition of a distinct and theretofore unlitigated right. "The suit in chancery does not draw in question the judgment and proceedings at law or claim a right to revise them. It sets up an equity independent of the judgment which admits the validity of that judgment, but suggests reasons why the party who has obtained it ought not to avail himself of it. It proposes to try a question entirely new,

which has not been and could not be litigated at law. It may be brought before the commencement of a suit at law, pending such suit, or after its decision by the highest law tribunal." *Parker* v. *Circuit Court,* 12 Wheat. 562, 564. See to the same effect, *Johnson* v. *Waters,* 111 U. S. 640, 667; *Arrowsmith* v. *Gleason,* 129 U. S. 86, 101; and *Marshall* v. *Holmes,* 141 U. S. 589.

Within these principles, then, the decree of 1858 was not erroneous but right. We do not impugn, but re-affirm, the doctrine so often announced that the awards of the land commission were final and conclusive if not appealed from within the time allowed by the statute, but we do say that the proceeds of such an award, like the fruits of a judgment at law, may be subjected to the equitable rights of others where those rights, if existing prior to the judgment, were suppressed through fraud committed by him who obtained the award upon one who could not act for himself, or have accrued since. To hold otherwise would be to place awards of the land commission upon a plane higher than that accorded to the most solemn judgments of courts of law acting within unquestioned jurisdiction. There is nothing in the judicial history of these Islands which would warrant us in according such a position to the judgments of the land commission. It does not militate against the view here taken that the land commission had jurisdiction to consider equitable as well as legal claims, for the circumstances of this case, which must be admitted to be exceptional, show that notwithstanding the broad powers of the land commission, a case may have occurred where a claim failed of presentation not merely without fault on the part of the one who, being incapable of acting on his own behalf, had the right to have it presented for him, but through the fraud of the one upon whom the law imposed the duty of presenting it on the other's behalf who successfully asserted it in his own name.

If the decree in *Kalakaua* v. *Pai and Armstrong* was right it ought to be enforced. If the decision in the *Lewers & Cooke*

case was correct the present bill should be dismissed, but if it was wrong, in justice to the appellee, it ought not to be followed if it can be avoided.

Being of the opinion that this court was wrong in the conclusion reached in the *Lewers & Cooke* case, and that the decree of 1858 was not "erroneous in a fundamental principle," and, for the reasons stated in the former opinion in the case at bar, should not be reopened, we should feel inclined to depart from the ruling made in the *Lewers & Cooke* case were we not bound by it because of its having been affirmed by the United States supreme court.

Counsel for the appellants contend that under the decree in the *Lewers & Cooke* case the whole matter is *res judicata*. But as the appellee was not a party to that case and is not a privy of Lewers & Cooke, Limited, the ground is untenable. Counsel for the appellee urge the doctrine of "the law of the case," invoking the former decision in the case at bar. Both sides seem to assume that the decisions in the two cases are in conflict. The *Lewers & Cooke* case, however, was decided on a point which was not touched upon in the decision on the demurrer in the present case, and although it was held in that case that the decree of 1858 ought not to be enforced the decision rested upon ground which was not inconsistent with that taken in the prior decision in the case at bar. The rule of the law of the case, therefore, does not as counsel have supposed, compel the choice of following one of two conflicting decisions. We think the application of that rule is not involved here. The point upon which this case now hinges was adjudicated in the case in which the appellee was not a party, but was not considered when this case was last before this court. In the *Lewers & Cooke* case the supreme court of the United States held that the decree made in *Kalakaua* v. *Pai and Armstrong* was erroneous and that the judgment of the land commission awarding the title to the land in dispute to Kinimaka was conclusive and binding against Kalakaua and those who claim through and

under him. That decision is binding upon this court and we must follow it. "Under the rule of *stare decisis,* where a principle has been passed upon by the court of last resort, it is the duty of all inferior tribunals to adhere to the decision, without regard to their views as to its propriety, until the decision has been reversed or overruled by the court of last resort or altered by legislative enactment." 26 A. & E. Enc. Law (2nd ed.) 163. It makes no difference that in making that decision the supreme court followed the opinion of this court upon a matter of local law (222 U. S. 294) and that we now believe that that opinion was not well founded. If the former ruling is to be reversed the reversal is to be made by that court and not this. The most that we can do now is to respectfully point out wherein, in our judgment, the former opinion was wrong. This we have done believing it was our duty to do it, and with this our duty in the premises ends. Counsel for the appellee argue that we are not bound to follow the decision of the United States supreme court in the *Lewers & Cooke* case because the fact that Kinimaka was the guardian of Kalakaua at the time the claim for this land was presented to the land commission was not included in the findings of fact which were certified up on the appeal to that court. The facts remain, however, that the guardianship had been found as a fact by the court of land registration and that finding was before this court in the *Lewers & Cooke* case, and that the decree entered in that case was affirmed on appeal, with the result, as above stated, that we are concluded by the decree.

The decree appealed from is, accordingly, reversed, and a decree will be entered in this court dismissing the bill of complaint.

*C. W. Ashford* and *D. L. Withington* (*Castle & Withington* with them on the brief) for plaintiff.

*Lyle A. Dickey* pro se and *A. A. Wilder* (*Thompson, Wilder, Watson & Lymer* on the brief) for defendants.

Kapiolani Estate v. Atcherley, 21 Haw. 441.

OPINION OF PERRY, J., CONCURRING IN PART AND DISSENTING
IN PART.

The material facts in this case are precisely the same as those
before this court and before the supreme court of the United
States in the *Lewers & Cooke* case reported in 18 Haw. 625,
19 Haw. 47 and 222 U. S. 285. The only fact contended by
the appellee to be before this court in the case at bar and not
to have been before the supreme court of the United States in
the *Lewers & Cooke* case is that Kinimaka was the guardian
of Kalakaua at the time that the claim for the land was pre-
sented to the Land Commission. In addition to the fact noted
in the majority opinion that the guardianship was found as a
fact by the court of land registration, that that finding was
before this court in the *Lewers & Cooke* case and that the
decree in that case was affirmed on appeal, the answer to the
contention is that this court deemed the fact of the alleged
fraud, and therefore of the guardianship immaterial and that
the supreme court of the United States considered the case as
though the fact of the guardianship was properly before it.
"It is immaterial whether Kinimaka had received the land
from Liliha or from Kaniu, and whether, if from Kaniu, he
was guilty of actual fraud in procuring his land commission
award or whether he acted under the honest belief that the dis-
approval of Kaniu's will by the King and the verbal giving
of the lands to him was conclusive." 18 Haw. 625, 638, 639.
"So it is said that Kinimaka was the natural guardian of
Kalakaua, we presume on the evidence that Kaniu assented to a
suggestion that she had better leave her property in Kinimaka's
hands till Kalakaua came of age. But it would be going rather
far to apply the refined rules of the English chancery concern-
ing fiduciary duties to the relations between two Sandwich
Islanders in 1846, on the strength of such a fact." 222 U. S.
285, 294. To grant the relief prayed for in this suit would be
to attempt to disregard and render ineffectual the decision of
the supreme court of the United States in the *Lewers & Cooke*

case. I concur in the view that that decision is binding on this court in the case at bar and that, following it, the decree appealed from should be reversed and a decree entered dismissing the bill of complaint.

This sufficiently disposes of the case, but since the majority has expressed its view to the effect that the decisions of this court and of the supreme court of the United States are incorrect, I feel impelled to state, briefly, my views on the subject.

In my opinion the decisions referred to were correct in regarding the equity decree of 1858 as an attack upon the land commission award to Kinimaka and in declining to countenance the attack. In form, perhaps, it was not; but in substance and in effect, it was. The appellee invokes the general rule relating to the jurisdiction in equity concerning judgments obtained by fraud. "The suit in chancery does not draw in question the judgment and proceedings at law or claim a right to revise them. It sets up an equity independent of the judgment which admits the validity of that judgment, but suggests reasons why the party who has obtained it ought not to avail himself of it. It proposes to try a question entirely new, which has not been and could not be litigated at law." *Parker* v. *Circuit Court,* 12 Wheat. 562, 564; and similar cases. That rule, however, can have no application to the case at bar or the suit in equity of 1858. If applied, it violates the spirit of the gift of Kamehameha III when he relinquished to the people his title to a large part of the royal domain and the spirit and the letter of the laws enacted to effectuate that gift. I cannot do better at this point than to quote from a familiar statement of the history of land titles in Hawaii. "There is a time in the history of every original nation not formed by colonization, when as it emerges from barbarism into civilization, titles to land may be said to have a beginning by positive institution of the people of such nation. Previous to the advent of Christianity to this country, in the early part of this century, Kamehameha

Kapiolani Estate v. Atcherley, 21 Haw. 441.

I., as King by right of conquest, was the lord paramount and owner of all the land of this Kingdom. This right continued in his successors until the reign of Kamehameha III. Under this King a government, under a constitution and laws, had its birth, superseding a government of the arbitrary will of the King. Claims of one character and another to the possession of land had grown up, but there was no certainty about them, and all was confusion; and finally, after years of discussion had between the King, the chiefs, and their foreign councillors, the plan of a Board of Commissioners to Quiet Land Titles was evolved, and finally established by law, for the purpose of settling these claims and affording an opportunity to all persons to procure valid paper titles emanating from the Government representing the sovereignty, the source of all title to land in this Kingdom, to the land which they claimed. As a part of this scheme Kamehameha III., with unexampled magnanimity, relinquished his claim of ownership as sovereign to over two-thirds of the entire territory of the Kingdom, in order that the same might be awarded to the chiefs and common people by the Land Commission. The Commission was authorized to consider possession of land acquired by oral gift of Kamehameha I., or one of his high chiefs, as sufficient evidence of title to authorize an award therefor to the claimant. This we must consider as the foundation of all titles to land in this Kingdom, except such as come from the King, to any part of his reserved lands, and excepting also the lists of Government and *Fort* lands reserved." *Thurston v. Bishop*, 7 Haw. 421, 428. Immediately prior, then, to the creation of the Land Commission, while claims of one character and another to the possession of land had grown up, there was no certainty about them. All was confusion. The constitution of October 8, 1840, sometimes referred to as the constitution of 1839 (see Thurston's Fundamental Law of Hawaii, p. 1), did, indeed, provide that "protection is hereby insured to the persons of all the people, together with their lands, their building lots, and

all their property, while they conform to the laws of the kingdom, and nothing whatever shall be taken from any individual except by express provision of the laws"; but it also declared: "Kamehameha I, was the founder of the kingdom, and to him belonged all the land from one' end of the Islands to the other, though it was not his own private property. It belonged to the chiefs and people in common, of whom Kamehameha I was the head, and had the management of the landed property. Wherefore, there was not formerly, and is not now any person who could or can convey away the smallest portion of land without the consent of the one who had, or has the direction of the kingdom." And in 1843 or 1844 we find the King disapproving of the will of Kaniu made subsequent to the date of the constitution. All was still chaos. It was for this very reason that the King, adopting an enlightened and progressive policy, made his gift. To me it seems impossible, under these circumstances, to regard Kaniu or upon her death her donee, Kalakaua, as holding even the beneficial or equitable ownership of the land as distinguished from the legal title. To sustain appellee's contention and uphold the decree of 1858 requires as an essential prerequisite the finding or the assumption that the equitable ownership at least, as that term is understood at the present day, was in Kaniu and from her passed to Kalakaua. Upon no other theory could Kinimaka or his heirs be declared to be trustees for Kalakaua.

The establishment of the Land Commission was a part of the scheme for the accomplishment of Kamehameha's purpose to relinquish his claims to the land and to vest titles in individuals. It was given power to hear and, finally determine, subject only to appeal to the supreme court, all claims to land and to make awards therefor. In its creation it was recognized by the King and all others concerned that "the Hawaiian rulers have learned by experience, that regard must be had to the immutable law of property, in things real, as lands, and in things personal, as chattels; that the well being of their country must essentially

depend upon the proper development of their internal resources, of which land is the principal; and that in order to its proper cultivation and improvement, the holder must have some stake in it more solid than the bare permission to evolve his daily bread from an article, to which he and his children can lay no intrinsic claim. They perceive by contact with foreign nations, that such is their uniform practice, and that the rules of right under that practice are contended for, understood and likely to be applied, in regard to the lands otherwise held at their hands by a tenancy incomprehensible to the foreigner. They are desirous to conform themselves in the main to such a civilized state of things, now that they have come to be a nation in the understanding of older and more enlightened governments." Principles of the Land Commission, R. L., p. 1171. The Board was given very broad powers. "A wide latitude is thus left to the Commissioners, who must, in passing upon the merits of each claim, first elicit from creditable witnesses, the fact or history of each; and thus assort or reconcile those facts to the provisions of the civil code, whenever there is a principle in past legislation applicable to the point under consideration; but when no such principle exists, they may judicially declare one, in accordance with ancient usage and not at conflict with any existing law, nor at variance with the facts, and altogether equitable and liberal." Ib., 1175. It had power, of course to refuse awards as well as to make awards. It considered equitable claims as well as legal (Ib., pp. 1169, 1175) as far as those terms could be applied to the kind of titles theretofore existing. It had power to make an award to one in trust for another. For illustrations of the exercise of that power see *Kane* v. *Perry,* 3 Haw. 663; and *Kalakaua* v. *Keaweamahi,* 4 Haw. 577. Claims of infants were presented by their parents or guardians and the statute prescribing a time limit for the presentation of claims made no exception in favor of infants. Minors were bound by the neglect of their guardians to present their claims. *Thurston* v. *Bishop,* 7 Haw. 421. So, also,

were all persons bound by an award, unappealed from, even though it was procured by false testimony.   *Kukiiahu* v. *Gill,* 1 Haw. 54.

In view of the uncertain tenures of land prior to the creation of the Land Commission, the King's gift and its terms, the provisions of the law intended for its accomplishment and the subsequent judicial declarations concerning the finality of the determinations of the Land Commission, the equitable jurisdiction over the fruits of a judgment obtained by fraud cannot be successfully invoked.   Relief was sought in 1858 and is sought now, not by reason of any facts occurring after the date of the award but by reason of facts all of which existed prior to the proceedings before the Land Commission.   There was no new question before the equity court in 1858, and there is none now, which could not have been litigated before the Land Commission.   If Kinimaka in a spirit of fairness, at the time of the presentation of his own claim to the land, whether that claim was through Liliha or through Kaniu, made known to the Commission the attempted devise by Kaniu to Kalakaua or if the latter fact otherwise appeared in evidence at the hearing (the failure of the Commission to record evidence to sustain an award does not vitiate it, *Kalakaua* v. *Keaweamahi,* supra), it was within the province of the Commission (a) to refuse to award the land to Kinimaka, or (b) to award it to Kinimaka in trust for Kalakaua, or (c) to award it to Kalakaua, or (d) to award it to Kinimaka.   If it decided, whether correctly or incorrectly, either that Liliha had a stronger claim than Kaniu or that Liliha's claim was unfounded and that the King's disapproval of Kaniu's oral will was effective and his own subsequent gift to Kinimaka good, it was beyond the power of the equity court, directly or indirectly, to set aside that decision or render it nugatory.   If, on the other hand, the fact of Kaniu's attempted devise to Kalakaua was not made known to the Commission, it was, as to Kalakaua, an instance of a minor bound by the failure of his guardian to present his

claim, whether the failure was due to mere neglect or to fraud. *Thurston* v. *Bishop* and *Kukiiahu* v. *Gill,* supra; and other cases cited in 18 Haw. 625. Cases of ordinary guardians, whose wards have, beyond controversy, the entire beneficial ownership of the land, and of persons entrusted by another with money to purchase land, are not parallel. Neither Kaniu nor Kalakaua had any unassailable title, legal or equitable; they had at most a mere right to apply to the Land Commission for a title. *Thurston* v. *Bishop,* 7 Haw. 421, 433. In the absence of an appeal to the supreme court the Commission's refusal or failure to award the land to them was conclusive. It is not as though a title existed, to be protected in equity. To the very existence of a title a land commission award was necessary.

The Hawaiian cases referred to in the opinion in the *Lewers & Cooke* case to my mind support and lead irresistibly to the conclusion there reached, that the decree of 1858 was an indirect attack on the award, that the award of the Land Commission is a final adjudication of all claims to the land awarded existing prior to December 10, 1845, that such awards are, with the exceptions mentioned in *Thurston* v. *Bishop,* supra, the foundation of all titles to land in these Islands and conclusive against every form of attack save the appeal provided by law,—a tradition "fortified by logic and good sense." 222 U. S. 285, 294, 295. In 18 Haw. 625, 638, it was correctly said that if the decree of 1858 shall be now enforced, "it will be the first time in the judicial history of Hawaii that a Land Commission award shall have been set aside upon any pretext whatever." Announcement should not now be made judicially that an awardee may, in spite of the award, possibly have been the holder of the bare legal title in trust for another and that he or his successors may be decreed in equity to convey to that other.